# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
MORRIS, ARGUELLES, and COOPER[1]
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Specialist TAYRON D. DAVIS**
**United States Army, Appellant**

ARMY 20220272

Headquarters, 21st Theater Sustainment Command
Charles L. Pritchard, Jr., Military Judge (arraignment)
Thomas P. Hynes, Military Judge (trial)
Colonel Tony Y. Kim, Staff Judge Advocate

For Appellant: Lieutenant Colonel Autumn R. Porter, JA; Jonathan F. Potter, Esquire; Major Bryan A. Osterhage, JA; Captain Jessica A. Adler, JA; Mr. (on supplemental brief); Colonel Philip M. Staten, JA; Jonathan F. Potter, Esquire; Major Bryan A. Osterhage, JA; Captain Jessica A. Adler, JA; (on supplemental reply brief.

For Appellee: Colonel Richard E. Gorini, JA; Lieutenant Colonel K.M. Bohlke, JA; Major Justin L. Talley, JA; Captain Stewart A. Miller, JA (on supplemental brief);

20 February 2026

------------------------------------------------------------------------
**MEMORANDUM OPINION ON REMAND ON RECONSIDERATION**
------------------------------------------------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

MORRIS, Senior Judge:

Where a military judge erred in denying a defense motion for expert assistance, then later indicated expert testimony was necessary at trial, significant doubt remains about appellant's opportunity to defend himself, warranting relief.

A military judge, sitting as a general court-martial, convicted appellant, contrary to his pleas, of two specifications of sexual assault in violation of Article 120, Uniform Code of Military Justice, 10 U.S.C. § 920 [UCMJ]. The military judge sentenced appellant to a dishonorable discharge and 120 days of confinement.

_____
[1] Judge ARGUELLES decided this case while on active duty.

This court previously set aside the findings and sentence and dismissed the charges with prejudice on other grounds. *United States v. Davis* (*Davis I*), ARMY 20220272, 2024 CCA LEXIS 144, at *17-18 (Army Ct. Crim. App. 27 Mar. 2024) (mem. op.). The Judge Advocate General of the Army subsequently certified two issues for review to the Court of Appeals for the Armed Forces [CAAF]. The CAAF reversed this court's decision and remanded for us to conduct "further review under Article 66, UCMJ, . . . of the claims that were mooted by [our] prior decision to overturn the conviction." *United States v. Davis*, 85 M.J. 295, 308 (C.A.A.F. 2025).

On 8 September 2025, this court again set aside and dismissed the findings and sentence, this time on factual sufficiency grounds, an issue mooted by our decision in *Davis I*.[2] *United States v. Davis* (*Davis II*), ARMY 20220272, 2025 CCA LEXIS 431, at *16-17 (Army Ct. Crim. App. 8 Sept. 2025) (mem. op.). Additionally, the *Davis II* court noted a separate issue warranting relief—the denial of a defense expert consultant. *Id.*, at *21-22.

Appellee requested panel reconsideration of our factual sufficiency analysis in *Davis II*, which was granted.[3] For the reasons discussed, *infra*, we agree with appellee and modify our position as to that issue. However, we separately reaffirm that part of our *Davis II* decision regarding the expert consultant issue, set aside the findings and sentence, and authorize a rehearing.[4]

## BACKGROUND

### A. The Charged Sexual Assault

Appellant and the victim were assigned to the same unit in Stuttgart, Germany and formed a close friendship over the course of five years. They spent time together, both in group and one-on-one settings, with appellant routinely spending the night at the victim's off-post apartment. On 24 November 2020, appellant came

---

[2] While we ordinarily conduct factual sufficiency review prior to addressing issues of law, this court resolved *Davis I* on a legal issue that impacted the fundamental fairness of appellant's court-martial. It was for that reason that this court originally dismissed the charges instead of authorizing a rehearing, the same relief that would have been afforded to appellant had we in *Davis I* found his conviction factually insufficient.

[3] Appellee also suggested en banc reconsideration of *Davis II*. That suggestion was not adopted.

[4] Each of the judges have carefully reviewed the other matter submitted personally by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and find it to be without merit.

to the victim's apartment with a bottle of alcohol and the pair became intoxicated. During the night, the victim became increasingly uncomfortable with appellant's perceived advances and made several trips to her bathroom to distance herself from appellant. During one of these ventures, she attempted to contact her platoon leader for help.

Eventually, a physical altercation between appellant and the victim broke out over appellant's behavior, a prior argument, and out of appellant's fear that the victim was suicidal. During the altercation, the victim punched appellant, prompting him to physically restrain her. Once appellant released her, she left for the bathroom. After the victim returned, appellant propositioned her for sex, causing her to leave for the bathroom again. When the victim returned to the living room, she found appellant asleep on the sofa. The victim fell asleep next to him but woke up to appellant performing oral sex on her. The victim told appellant to stop and attempted to push him away but was unable to do so. She finally succeeded in halting the assault when she pulled up her pants and pushed appellant away. Hoping to prevent any further contact, the victim suggested she and appellant go to her room to sleep. After falling asleep, the victim woke up to appellant digitally penetrating her vulva. The victim reported in the following days that appellant sexually assaulted her twice that evening, once on her sofa when she awoke to appellant performing oral sex on her, and the second time, in her bed when she woke up to appellant digitally penetrating her.

During the course of the investigation, the victim provided three statements to Army Criminal Investigation Division (CID): two formal interviews and one during the course of a walkthrough of her apartment.[5] In her first statement,[6] given approximately one week after the sexual assault, the victim described engaging in "heav[]y drinking," resulting in her having "various gaps in her memory or recollection from the evening of the incident." The victim did not mention oral copulation or vaginal penetration, other than stating that appellant attempted to put his hands down her pants after she asked him "to go to her bed to go to sleep." The first interview was terminated upon the victim's request for a Special Victim's

---

[5] Significant portions of the victim's statements to CID were admitted at trial during the defense case-in-chief via testimony of the two special agents who conducted interviews with her.

[6] Trial counsel objected when defense counsel asked the agent to recount the victim's description of the sexual assault. Though trial counsel did not mount a standing objection, defense counsel's response—that the agent's testimony was being offered to impeach the victim's testimony—was broad enough to effectively treat the objection as such. Because of this, we considered the first agent's testimony for the effect, if any, it had on the victim's credibility, not as substantive evidence.

Counsel. As such, the victim testified she did not have the opportunity to fully describe the night of the charged assault in her first interview.

The victim's second and third statements occurred later and were made to a different CID agent.[7] Like her first interview, the victim recounted being "very intoxicated" with "memory lapses" in addition to "slurred speech" and "stumbl[ing] while walking." She also acknowledged having "anxiety" and inviting appellant "over as a friend" to comfort her and stated that while the appellant physically restrained her, she could not remember how. The victim also told the agent that appellant asked to kiss the victim, which she denied. Unlike before, the victim mentioned that she had fallen asleep on the sofa and woke up to appellant "licking her vagina" and that when she asked appellant to stop performing oral sex on her, "[h]e continued on for a couple of seconds, and then she asked him – and then he stopped after a couple of seconds." Regarding the second assault, the victim remembered waking up to appellant "inserting and rubbing the top of her vagina" with his finger. The next memory she had was waking up the next morning wearing two pairs of pants.[8]

At trial, the victim testified she and appellant had been close friends for five years and sometimes joked about engaging in sexual acts with each other. However, they had never engaged in any type of sexual activity. Sometime prior to 24 November 2020, appellant attempted to facilitate a threesome, which the victim rejected, causing a rift. As a result, appellant and the victim got into an argument and did not speak for months.

Concerning the night of the incident, the victim testified that she remembered being assaulted by appellant; she remembered him putting his mouth on her vulva while they were on the couch and she told him to stop. The government admitted a photograph of the victim's ribcage with scratches she testified were from appellant when he attempted to pull her body forward in order to conduct oral sex. The victim also testified that she remembered appellant inserting his finger into her vulva while they were in bed.

On cross-examination, the victim acknowledged she was intoxicated on the night of the incident but denied any impact on her memory as a result of her

---

[7] With two exceptions—first, regarding how appellant responded to the victim's demand to stop performing oral sexual acts on her, and second, the reasoning for why the victim did not ask appellant to leave the night of the charged acts—none of the second agent's testimony prompted a hearsay objection from trial counsel. As such, we consider the majority of the second agent's testimony substantively.

[8] The victim stated she let appellant stay the night because she did not want him to drive home given his state of intoxication.

4

intoxication. Nonetheless, the victim stated she could "not recall" portions of her CID interviews, including why she could not disengage from the altercation, whether appellant complied when she said "no" during the assault, or whether appellant digitally penetrated her. The victim also acknowledged that while she might have joked to appellant about "threesome[s]," she never expressed interest in him outside friendship, never seriously propositioned him for sex, and never kissed him.

On redirect, trial counsel admitted several messages sent by the victim to her platoon leader before the first charged sexual act. These messages included, "I'm terrified at the moment," "Please help," and "Talk to me [please]." Approximately one hour later, additional messages were sent by the victim, including, "Hey motherf***** is being weird[.] I'm about to hit him hard in his face am I crazy? [I don't know] anymore?"

In addition to the victim, the government elicited testimony from two of appellant's friends, who spoke with him the day after the alleged assault. The first friend testified that appellant relayed he and the victim "made out . . . foreplay happened," including him digitally penetrating the victim, "and then they both went to bed naked." The first friend also testified that appellant called the witness for advice because he was "confused" and "blindsided" by the victim's behavior afterwards. The second friend similarly testified appellant called her for advice and discussed the incident with her. According to the second friend, appellant acknowledged performing oral sex on the victim but stated he stopped when asked by the victim. He also told the friend that the pair slept in the same bed immediately after. Like the first friend, the second stated appellant sounded "confused" and appeared to be "blindsided" by the victim's allegations. Lastly, the victim's platoon leader testified that on 30 November 2020, the victim reported she was sexually assaulted. The platoon leader had also recently received late night Facebook messages from the victim the night of the sexual assault but did not know their content because the victim had "unsent" the messages before they were read.

The defense called six witnesses from the appellant's and the victim's friend group or unit. Five witnesses provided opinion or reputation evidence regarding the victim, testifying that she was untrustworthy or "not truthful."[9] Four of those witnesses testified they were friends with appellant, but not friends with the victim.

---

[9] Not all of the witnesses had the same level of familiarity with the victim; some had only brief or limited interactions with her. One witness based his opinion on being in the same company with the victim and working with her "a couple of times on the road . . . like patrol." Another described knowing the victim "vaguely" based on her position in the supply office. The third had been the victim's squad leader for six months. The final two testified the victim was in their company and in their "friend group."

The remaining two testified the victim was in their "friend group," but they were closer friends with appellant.

One witness testified they heard the victim talk to appellant about sex. Another described an incident that occurred five months before the assault: when driving home after a night of drinking, the victim commented, "I'm going to have sex with [appellant]," prompting laughter from everyone else in the vehicle. Another witness testified that he observed appellant and the victim "grinding" and kissing at a club one night.[10] Lastly, another witness testified appellant and the victim were very close—"two peas in a pod"—and that he was present for multiple instances when the victim discussed finding a third sexual partner to participate in a threesome with appellant. The victim testified that within their friend group it was common to joke about sex and admitted she had joked with appellant about threesomes. However, when he attempted to act on it, she had refused.

*2. Defense Request for Expert Assistance*

Before trial, defense moved to compel the appointment of a forensic psychiatrist to provide expert assistance on alcohol-induced blackouts. The defense cited the need for expert assistance to support the following:

> (a) [U]nderstanding memory formation and encoding as it relates to the consumption of alcohol; (b) understanding how alcohol affects a person's cognition, and specifically how the alcohol consumed by [the victim] and [appellant] may have impaired their cognitive functions; (c) understanding how alcohol affects decision-making, (d) understanding how alcohol affects sleep and a person's perception of reality if they are awaken[ed] in an intoxicated state . . . . [D]efense counsel are not qualified to conduct this analysis.

Defense further stated, "Regardless of defense counsel's research, the Defense will not be able to offer the same opinions [as the expert] . . . . Defense would need additional education that would unreasonably delay this proceeding." Defense's motion was accompanied by excerpts from the CID investigation into appellant, which summarized the victim as having stated "her level of intoxication caused her to . . . not remember what happened [unintelligible] some periods of the night."

At a motions hearing, the defense expounded on their request for expert assistance. Defense stated that while they could "easily Google or look up these things," they had "no basis, . . . no medical knowledge, to be able to analyze these

---

[10] The victim acknowledged "grinding" on appellant but denied kissing appellant.

[issues]" or "be able to tell how it applies to the facts in [the] case[]." In response, the military judge queried, "beyond googling the subject, you haven't done anything to understand the impact of alcohol on memory or the difference between a blackout and a pass out; or how alcohol affects people of different genders, body size, and alcohol tolerance?" While somewhat acquiescing to the military judge's contention, the defense reiterated their need for expert assistance.

The military judge denied the defense motion on 14 April 2022, writing:

> The Defense claims that it needs an expert's help to understand alcohol's effects on memory, cognitive function, sleep, and perception of reality if awakened in an intoxicated state. All of this information is *all too common knowledge*, particularly in the world of criminal law. It is so common that there is a standard findings instruction on voluntary intoxication, "The law recognizes that a person's ordinary thought process may be materially affected when he is under the influence of intoxicants."
>
> . . .
>
> Defense would have an expert do for them what they are expected to do as advocates – assess a witness's ability to perceive events and show how that perception may have been limited through thorough, well-prepared cross examination of that witness.
>
> Defense asserts that it is not educated in the "field of alcohol," or its impact on the body and behavior . . . and requires an expert to decipher "the technical concepts therein." When pressed to describe what it had done to fill this apparent gap in its case preparation, Defense stated that it had "googled" some of the concepts, but offered nothing more. . . . *To the extent that "blackouts" or "pass-outs" are technical concepts, Defense provided no evidence* that the [victim] either blacked out or passed out, *only that she claims not to remember* some of the events from the night of the alleged assaults.

(emphasis added).

During closing, defense argued, without objection, "[i]t's a classic fragmentary blackout: [d]oing something and not remember[ing] doing it." Defense further emphasized this idea, arguing the alleged victim was "[i]n and out of

7

fragmentary blackout." Government counsel objected, "[c]ounsel is testifying on an expert issue that defense counsel neither put any evidence into – into play, nor has proper expert qualification to testify to himself." The military judge sustained the objection with the following admonition to the defense:

> You can argue inferences from her lapse in memory; but I think, if you're referring to something that – for example: *I don't know what a fragmentary blackout is*. So, when you say a "classic fragmentary blackout," to the extent that requires some expert testimony to diagnose and explain, I'm not going to consider that.

(emphasis added).

## LAW AND DISCUSSION

### A. Factual Sufficiency

This court "may affirm only such findings of guilty, and the sentence or such part or amount of the sentence, as the Court finds correct in law and fact and determines, on the basis of the entire record, should be approved."[11] UCMJ art. 66(d)(1). We conduct a de novo review for factual sufficiency and independently assess whether the evidence at trial proved an appellant's guilt beyond a reasonable doubt. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). In doing so, however, we are "limited to the evidence presented at trial." *United States v. Beatty*, 64 M.J. 456, 458 (C.A.A.F. 2007) (citation omitted). "Such a review involves a fresh, impartial look at the evidence, giving no deference to the decision of the trial court on factual sufficiency beyond the admonition in Article 66(c), UCMJ, to take into account the fact that the trial court saw and heard the witnesses." *Washington*, 57 M.J. at 399; *see also* UCMJ art. 66(c).

Examining the record de novo, we find the evidence sufficient to prove appellant's guilt beyond a reasonable doubt. The victim testified clearly that she: (1) declined appellant's romantic advances, first a kiss, then a proposition for sex, (2) contemporaneously reached out to her platoon leader for assistance with the uncomfortable situation she was in with appellant, and (3) physically and verbally articulated non-consent to appellant.

While the majority in *Davis II* accurately highlighted the numerous interactions and conversations between the victim and appellant preceding the

---

[11] Because the offenses for which appellant were found guilty occurred before 1 January 2021, we apply our historic factual sufficiency review. *See United States v. Harvey*, 85 M.J. 127 (C.A.A.F. 2024).

charged sexual assault, none of these interactions or conversations provide evidence of consent or establish why appellant's mistake of fact was reasonable or even existed. *See* 2025 CCA LEXIS 431, at *8-11. In fact, in light of the victim having previously rejected appellant's attempts to coax her into sexual activity, he should not have expected this night to be any different.[12] The relevance of that evidence was further weakened by the temporal space between those words or actions and the charged misconduct. Put another way, while the victim may have, months previously, indicated a sexual interest in appellant, on the night of the charged misconduct, she made her lack of interest in appellant's sexual advances quite clear. It is also important to note that the time between those prior comments and the assault were interrupted by an argument between appellant and victim over the same subject. This disagreement was so intense that it resulted in two close friends not speaking for several months.

Relevant to consent on the night in question is evidence that before either appellant or the victim fell asleep, appellant directly requested to initiate sexual activity multiple times and the victim never acquiesced. Instead, she left the room, sent messages to her platoon leader and only returned to the living room after appellant had fallen asleep. She then sat upright on her couch to watch television, near where appellant was sleeping, fell asleep, and woke up to appellant performing oral copulation on her. Once she realized what was happening, she immediately told him to stop, which he did reluctantly after a few more seconds. Then, in an attempt to remove herself from the area, she told appellant they should go to her room to go to sleep, which they did, only for her to be awoken once again to find appellant digitally penetrating her. Once she stopped the assault, she put on an extra pair of pants and went back to sleep. Even if her testimony was that she did not recall how or why she put on two pairs of pants, it is unlikely that consenting to sexual activity includes putting on additional clothes.

Considering the nature of the evidence at issue, in-court testimony of various witnesses, the military judge who "saw and heard the witnesses" in appellant's

---

[12] We note a logical parallel recently employed by our superior court in *United States v. Moore*, __ M.J. __, 2026 CAAF LEXIS 73 (C.A.A.F. 23 Jan. 2026). There, when discussing conflicting charging theories in a sexual assault case (i.e., "without consent" versus "incapable of consent"), the CAAF noted, "it is legally sufficient if the victim does not consent to the sexual act prior to the start of a period of incapacity." *Id.*, at *11 n.4. Similarly, here, the victim had established her lack of consent to any *actual* sexual activity, regardless of innuendo or bravado. As consent is "a freely given agreement to the conduct at issue," UCMJ art. 120(g)(7), we find no evidence indicating appellant was reasonably justified in believing the victim would acquiesce to the charged misconduct.

court-martial is due a high degree of deference.[13] *E.g.*, *Washington*, 57 M.J. at 399; *see also United States v. Crews*, ARMY 20130766, 2016 CCA LEXIS 127, at *11-12 (Army Ct. Crim. App. 29 Feb. 2016) (mem. op.) ("The deference given to the trial court's ability to see and hear the witnesses and evidence – or "recogni[tion]" as phrased in Article 66, UCMJ – reflects an appreciation that much is lost when the testimony of live witnesses is converted into the plain text of a trial transcript. . . . [The factfinder] hears not only a witness's answer, but may also *observe* the witness as he or she responds." (emphasis and first alteration in original)), aff'd, 76 M.J. 350 (C.A.A.F. 2017). The military judge observed each witness testify and, crucially, was able to make credibility determinations about each. This includes the numerous witnesses, all friends of appellant with varying degrees of acquaintance with the victim, who attacked her reliability and truthfulness. Ultimately, the military judge found these attacks unpersuasive and found appellant guilty of both charged instances of sexual assault.[14]

We concur. Based on the surrounding circumstances, the government proved beyond a reasonable doubt the victim did not consent to either sexual act. Furthermore, even if a mistake of fact somehow existed in appellant's mind, it was not reasonable. While the victim, in some instances, did not vocalize her internal thoughts to appellant, the verbal and nonverbal communication she did share was sufficient to deflate any reasonable mistake of fact appellant may have had as to the victim's consent.[15] The victim specifically testified that each assault was initiated

---

[13] Under our new factual sufficiency standard, we would be *required* to give "appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence." UCMJ art. 66(d)(1)(B)(i)(I) (Supp. III 2019-2022).

[14] Contrary to the majority position in *Davis II*, we do not find the victim's credibility was undermined by the group of appellant's friends who testified that she had a character for untruthfulness, nor by her cross-examination at trial (which was caused by a purposefully confusing examination technique employed by defense counsel). *See generally* 2025 CCA LEXIS 431, at *13-17. Reasonable inferences from the testimony of at least two of these people establish that they were surprised when appellant told them his version of what occurred that night. Despite the public flirtations between appellant and the victim, neither person expected them to act on the behavior, it simply was not taken seriously, which is in line with the victim's characterization of their sexual banter.

[15] For instance, we draw particular attention to the fact that appellant propositioned the victim for sex, which she declined, before leaving the room. Upon her return, the victim fell asleep sitting on the sofa next to appellant. She was then woken up by appellant performing oral sex on her. Given the victim's specific, prior declination, it was unreasonable for appellant to believe that she would have consented to this sexual act.

while she was asleep. At no time during this evening did she accept any of his direct offers to initiate sexual activity, and it is undisputed she had never accepted any of his prior offers to engage in sexual activity. Thus, it was not reasonable for him to think she was going to consent, which was confirmed by her actions each time she was awakened by the assault in-progress. Accordingly, we find appellant's conviction factually sufficient.

### B. Expert Consultant

The military judge's denial of expert assistance to defense warrants relief.

"No person shall . . . be deprived of life, liberty, or property, without due process of law . . . ." U.S. Const. amend V. Further, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor . . . ." U.S. Const. amend VI. "Whether rooted directly in the Due Process Clause . . . or in the Compulsory Process or Confrontation clauses of the Sixth Amendment . . . the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (internal quotation marks omitted) (citations omitted).

An accused is entitled to government-provided expert assistance upon a showing of its necessity. Rule for Courts-Martial 703(d)(1); *see also, e.g., United States v. Tinsley*, 81 M.J. 836, 841 (Army Ct. Crim. App. 2021), pet. denied, 82 M.J. 372 (C.A.A.F. 2022). To prevail, an appellant must establish that "a reasonable probability exists that (1) an expert would be of assistance to the defense and (2) that denial of the expert assistance would result in a fundamentally unfair trial." *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010) (internal quotation marks omitted) (citation omitted). To determine whether expert assistance would benefit defense and establish necessity, courts consider: "First, why the expert assistance is needed. Second, what would the expert assistance accomplish for the accused. Third, why . . . the defense counsel [was] unable to gather and present the evidence that the expert assistant would be able to develop." *United States v. Gonzalez*, 39 M.J. 459, 461 (C.M.A. 1994) (citation omitted). However, there must be "more than the 'mere *possibility* of assistance from a requested expert.'" *Lloyd*, 69 M.J. at 99 (emphasis in original) (quoting *United States v. Bresnahan*, 62 M.J. 137, 143 (C.A.A.F.

11

2005)).[16]  Instead, there must be a "reasonable probability" that the expert would assist the defense.  *Bresnahan*, 62 M.J. at 143.[17]

This court reviews a military judge's decision denying defense's request for expert assistance for an abuse of discretion.  *Lloyd*, 69 M.J. at 99 (citing *Bresnahan*, 62 M.J. at 143).  An abuse of discretion occurs when the military judge: "(1) predicates his ruling on findings of fact that are not supported by the evidence; (2) uses incorrect legal principles; (3) applies correct legal principles to the facts in a way that is clearly unreasonable; or (4) fails to consider important facts." *United States v. Becker*, 81 M.J. 483, 489 (C.A.A.F. 2021) (quoting *United States v. Commisso*, 76 M.J. 315, 321 (C.A.A.F. 2017)) (internal quotation marks omitted).

Based on this record, the defense established that expert assistance was necessary to help them support and explain their theory of the case.[18]  Specifically, it was possible the victim either consented to the sexual acts or acted in a way to support a finding that appellant reasonably believed she consented, but that she could not or remember these actions due to the effects of fragmentary blackouts.  Only with expert assistance, could the defense reasonably evaluate whether the evidence in the case was consistent with how fragmentary blackouts happen, so they could then perhaps seek an expert witness to explain it to the court-martial.

The military judge's own response to the government's objection to closing argument illustrates the problem.  In his ruling, the military judge disclaimed knowing what a fragmentary blackout was.  Yet previously, when ruling on the defense motion to compel expert assistance, the same judge assessed the topic as "all

---

[16] We further note the expectation that defense counsel are "expected to educate themselves to attain competence." *E.g.*, *United States v. Kelly*, 39 M.J. 235, 238 (C.A.A.F. 1994).

[17] The military judge must decide "whether the probative value of evidence is 'substantially outweighed by the danger of unfair prejudice.'" *United States v. Collier*, 67 M.J. 347, 353 (C.A.A.F. 2009).  The probative weight of evidence cannot be weighed in a vacuum but must be evaluated based on the basis for which it was offered.

[18] We stress that our analysis is limited to the facts of this record.  This opinion should not be read as mandating expert assistance merely based on the presence of alcohol.  In this case, however, we further note that the military judge's finding— that the defense had failed to provide any evidence of an alcohol-induced blackout was clearly erroneous.  This shortcoming, on its own, constitutes an abuse of discretion.

too common." The subsequent denial of the defense's inferential argument[19] was also grounded in the judge's determination that defense counsel was impermissibly trying to testify as an expert witness. This further establishes there was "more than a mere possibility of assistance from a requested expert." *Lloyd*, 69 M.J. at 99 (quoting *Bresnahan*, 62 M.J. at 143).

The military judge's decision was outside the bounds of reasonable judicial discretion. Whether one characterizes his statements as conclusions, findings of fact, or a mixture of both, his multiple assertions that knowledge of alcohol-based blackouts is "common" was equally unsupported by this record. Even in his reference to the Benchbook *mens rea* instruction, the military judge contradicted his "common" knowledge finding/conclusion. If the effects of intoxication were commonly-known, the military judge would not be required to describe them in panel instructions. In light of the information the defense provided the military judge before trial – the victim's alcohol consumption, intoxication, and report of memory gaps to law enforcement – and the specialized knowledge required to understand the physiological processes of how blackouts happen – we also find he clearly missed the mark in ruling that the defense had not established the necessity of expert assistance or its centrality to the defense and a fair trial.

"To rise to the level of constitutional error, a ruling must have infringed upon a weighty constitutional interest of the accused." *United States v. Dimberio*, 56 M.J. 20, 26 (C.A.A.F. 2001) (citing *United States v. Scheffer*, 523 U.S. 303, 308 (1998)). Exclusion of "reliable and [potentially] highly probative evidence" has been found by our superior court to infringe on those interests. *E.g.*, *United States v. Maebane*, __ M.J. __, 2025 CAAF LEXIS 772, at *28 (C.A.A.F. 18 Sept. 2025). Further, in *United States v. McAllister*, our superior court held that a military judge's erroneous ruling denying appellant expert assistance deprives him of the right to present a defense, "a fundamental element of due process of law." 64 M.J. 248, 252 (C.A.A.F. 2007) (citations omitted). Accordingly, we review such errors under the constitutional harmless error standard, which requires the government to demonstrate that the error is harmless beyond a reasonable doubt such that there is no reasonable probability it contributed to the contested findings of guilty. *Id.* at 252-53. The government has not met that burden where the record leaves open the distinct possibility of a different verdict had the defense received the requested expert assistance.

## CONCLUSION

The findings of guilty and the sentence are SET ASIDE. A rehearing is authorized.

---

[19] We also hold the military judge clearly erred in determining defense counsel was testifying, rather than commenting on the evidence.

DAVIS – ARMY 20220272

COOPER, Judge, concurring in part and in the result, concurring dubitante in part;

I agree with Senior Judge Morris insofar as she finds the military judge erred in denying a defense motion for expert assistance. However, I write separately to address my belief that the factual sufficiency review conducted on remand in *Davis II* is beyond the scope of our superior court's mandate. *United States v. Davis*, 85 M.J. 295, 308 (C.A.A.F. 2025). I therefore respectfully concur in part and concur dubitante in part.

On a remand from our superior court, "a Court of Criminal Appeals 'can only take action that conforms to the limitations and conditions prescribed by the remand.'" *United States v. Riley*, 55 M.J. 185, 188 (C.A.A.F. 2001) (quoting *United States v. Montesinos*, 28 M.J. 38, 44 (C.M.A. 1989)). This case was returned to us from the Court of Appeals for the Armed Forces [CAAF] not for a new Article 66 review but "for a *further* review under Article 66, UCMJ, 10 U.S.C. § 866 (2018), of the *claims* that were *mooted* by the lower court's prior decision to overturn the conviction." *Davis*, 85 M.J. at 308 (emphasis added).

The initial opinion from this court referenced appellant's remaining *Grostefon* matter as "moot" due to the ultimate disposition to set aside the findings and sentence for judicial error. *United States v. Davis* (*Davis I*), ARMY 20220272, 2024 CCA LEXIS 144, at *2 n.2 (Army Ct. Crim. App. 27 Mar. 2024) (mem. op.), rev'd, 85 M.J. 295 (C.A.A.F. 2025). Therefore, I view this mandate from CAAF as a deliberate response to our prior opinion. Upon CAAF's reversal, the remand language makes clear that *only* the "mooted" matters were returned to us for consideration. *Davis*, 85 M.J. at 308. I do not believe CAAF's direction authorizes a new Article 66, UCMJ, review; it limits review to the specific matters mooted. CAAF regularly remands cases for a new Article 66 review.[20] It has the language to do so at the ready. However, it specifically did not do so here. Simply reading the plain language of CAAF's mandate, CAAF limited review to appellant's mooted matters and did not direct a new Article 66 review in full.

Furthermore, the initial opinion from this court stated, "[w]e review the case under Article 66, UCMJ." *Davis I*, 2024 CCA LEXIS 144, at *2. This signals to me appellant already received a full review under Article 66, UCMJ, which would include factual sufficiency. *See* UCMJ art. 66(d)(1) (2018). Generally, this court does not conduct a new factual sufficiency review each time a case is remanded to us

---

[20] *E.g.*, *United States v. Mendoza*, 85 M.J. 213, 223 ("The record of trial is returned to the Judge Advocate General of the Army for remand to the United States Army Court of Criminal Appeals for a new factual and legal sufficiency review under Article 66 . . . ."); *see also United States v. Antepara*, 85 M.J. 399 (C.A.A.F. 2025), *United States v. Coe*, 85 M.J. 211 (C.A.A.F. 2025), *United States v. Lopez*, __ M.J. __, 2025 CAAF LEXIS 735 (C.A.A.F. 2 Sept. 2025).

14

from our superior court. "While appellant is entitled to plenary review under Article 66 . . . he is only entitled to one such review." *United States v. Smith*, 41 M.J. 385, 386 (C.A.A.F. 1995).

My colleagues' position is that the factual sufficiency review was one of the issues mooted by the initial opinion. *See infra* (Arguelles, Judge, concurring in part, dissenting in part.). However, CAAF's remand was only "of the *claims* that were mooted by the lower court's prior decision." *Davis*, 85 M.J at 308 (emphasis added). Appellant did not raise any claim of factual sufficiency, so I believe it was not open to consideration based on the language of CAAF's remand.[21]

In a case such as this:

> "All that is to be done on remand is for the court below to consider the matter which is the basis for the remand and then to add whatever discussion is deemed appropriate to dispose of that matter in the original opinion. . . . This procedure does not permit or require starting the review process anew or setting aside action favorable towards an accused on other grounds."

*United States v. Kelly*, 78 M.J. 638, 640 (Army Ct. Crim. App. 2018) (quoting *United States v. Ginn*, 47 M.J. 236, 238 n.2 (C.A.A.F. 1997)), pet. denied, 79 M.J. 206 (C.A.A.F. 2019). Accordingly, I believe the scope of our review should be limited to the "claims" raised by appellant in his initial brief and "mooted" by this court's initial decision.

However, recognizing that the previous panel did conduct a factual sufficiency review upon remand, and the panel split on the factual sufficiency question, I am compelled to consider factual sufficiency here, as it affects the final disposition of this case. I concur with Senior Judge Morris that the case is factually sufficient, even given my belief it goes beyond the authorized remand by our superior court.

Finally, concerning the expert issue that is properly before us, I concur with my colleagues in finding the military judge erred in denying a defense motion for

---

[21] I fully recognize in a pre-*Harvey* case, appellant is not required to assert factual sufficiency as error to trigger this review. *See generally United States v. Harvey*, 85 M.J. 127, 129-131 (C.A.A.F. 2024) (distinguishing our historic and amended factual sufficiency review pursuant to 10 U.S.C. § 866(d)(1) (2018) and 10 U.S.C. § 866(d)(1)(B) (Sup. III 2019-2022), respectively). However, the language CAAF used references "claims that were mooted," thereby signaling they were only remanding "claims" that appellant had personally raised. *Davis*, 85 M.J. at 308.

expert assistance. Therefore, I agree that setting aside the findings and sentence and authorizing a rehearing is the appropriate result in this case.

ARGUELLES, Judge, concurring in part, dissenting in part;

While I agree with the lead opinion that the military judge's denial of expert assistance warrants relief, because appellant's conviction is factually insufficient, the Charge and its specifications should be set aside and dismissed.[22] I also write separately to address my colleague's contention that we are precluded from considering the issue of factual sufficiency on remand.

*A. Scope of Remand*

In his initial appeal, appellant asserted that the reassignment of the military judge who presided over his trial violated his due process rights. Appellant also raised two claims pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982): (1) the military judge erred in denying his motion to compel expert assistance; and (2) a violation of his Rule for Courts-Martial [R.C.M.] 707 speedy trial rights. In our initial opinion, we held that the conduct of the trial judges constituted "structural error mandating reversal, because the improper conduct of both trial judges 'affected the framework within which the trial proceed[ed].'" *United States v. Davis* (*Davis I*), ARMY 20220272, 2024 CCA LEXIS 144, at *15 (Army Ct. Crim. App. 27 Mar. 2024) (mem op.) (alteration in original). Notwithstanding the fact that appellant raised two *Grostefon* claims, we only addressed the first one, noting in a footnote that, "[w]e have fully and fairly considered appellant's remaining matter under [*Grostefon*]. Our disposition renders it moot, but we do harbor concern that an impartial observer could reasonably conclude that the interests of speed improperly influenced the military judge to deny appellant's motion for expert assistance." *Id.*, at *2 n.2.

The Court of Appeals for the Armed Forces [CAAF] reversed this court's decision in *Davis I*, stating in its judgment that "[t]he case is returned to the Judge Advocate General of the Army for remand to the Court of Criminal Appeals for a further review under Article 66, UCMJ, 10 U.S.C. § 866 (2018), of the claims that were mooted by the lower court's prior decision to overturn the conviction." *United States v. Davis*, 85 M.J. 295, 308 (C.A.A.F. 2025). On remand, we held that appellant's conviction was factually insufficient and that the military judge erred in denying appellant's request for expert assistance. *United States v. Davis* (*Davis II*), ARMY 20220272, 2025 CCA LEXIS 431, at *22 (Army Ct. Crim. App. 8 Sept. 2025) (mem. op.).

---

[22] I also agree with the lead opinion's finding that the other matter submitted personally by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982) is without merit.

First, it is worth noting that our election not to address factual sufficiency in *Davis I* did not, standing alone, preclude us from reviewing it in *Davis II*. Directly on point is *United States v. Steele*, 83 M.J. 188 (C.A.A.F. 2023), in which appellant raised new issues with this court after the CAAF remanded our prior decision. Rejecting our imposition of a "cause and prejudice" standard barring appellant from raising new issues that were not part of his initial appeal, the CAAF instead held: "[a] CCA's discretion under Article 66(c), UCMJ, however, runs in only one direction: although a CCA may choose to review a waived issue, a CCA cannot refuse to review an issue that was not waived." *Id.* at 190, 191. As such, because appellant has never affirmatively waived a factual sufficiency challenge, the fact that we elected to provide relief and *dismiss* the charge and specification on other grounds in *Davis I*, in effect "mooting" any factual sufficiency review, does not preclude us from considering that issue on remand.

My colleague now asserts that, because the CAAF chose to use the language "claims that were mooted by the lower court's prior decision to overturn the conviction," *Davis*, 85 M.J. at 308, on remand we can consider only the two prior *Grostefon* claims and cannot conduct a factual sufficiency review. *See supra* (COOPER, Judge, concurring in part and in the result, concurring dubitante in part). I respectfully disagree.

To the extent my colleague asserts that the CAAF mandate on remand is a "deliberate response to our prior opinion," *id.*, in *Davis I* we only referred to *one* of appellant's *Grostefon* claims, the failure to appoint an expert, as being "mooted." *Davis I*, 2024 CCA LEXIS 144, at *2. As such, if the CAAF wanted to limit the scope of our remand to only what we considered "moot" in *Davis I*, it would not have used the word "claims" in the plural in its remand order.

More fundamentally, if the CAAF wanted to limit the scope of our review on remand to a specific issue, it certainly knows how to do so. *See, e.g., United States v. Kelly*,77 M.J. 404, 408 (C.A.A.F. 2018) ("The record of trial is returned to the Judge Advocate General of the Army for remand to the United States Army Court of Appeals for an assessment of sentence appropriateness . . . ."); *United States v. Navarette*, 81 M.J. 400, 406 (C.A.A.F. 2021) ("The record of trial is returned to the Judge Advocate General of the Army for remand to that court for proceedings in accordance with R.C.M. 1203(c)(5).").

Put another way, rather than attempt to "piece together" or look beyond the remand order to discern its meaning, I simply read the mandate's plain language for what it says. *United States v. Kelly*, 78 M.J. 638, 639 (Army Ct. Crim. App. 2018) ("We begin our analysis, as we must, with the plain language of our superior court's [remand] order."). Because factual sufficiency was one of the claims "mooted" by our ruling in *Davis I*, it is within the scope of the remand order and we may properly consider it on remand.

17

### B. Factual Sufficiency

As correctly noted by the lead opinion, our factual sufficiency review in this case "involves a fresh, impartial look at the evidence, giving no deference to the decision of the trial court on factual sufficiency beyond the admonition in Article 66(c), UCMJ, to take into account the fact that the trial court saw and heard the witnesses." *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). Put another way, we independently assess whether the evidence at trial proved appellant's guilt beyond a reasonable doubt. *Id.*

In all three of her interviews with Army Criminal Investigation Division (CID) special agents, the victim described engaging in "heavy drinking" on the night in question, resulting in her having "various gaps in her memory or recollection." The victim also told CID that she was "very intoxicated" with "memory lapses," and described herself as exhibiting "slurred speech and "stumbl[ing] while walking."

Contrary to the statements she made to CID, however, at trial the victim provided a much more detailed and specific accounting of everything that happened during the evening. Among other things, the victim testified as to significant details that were omitted from some or all of her CID interviews, including: (1) how appellant restrained her and why; (2) whether appellant performed oral sex on her; (3) whether and how appellant digitally penetrated her; and (4) why she woke up wearing two pairs of pants. Although the victim terminated her first CID interview early to allow her to obtain counsel, the victim admitted at trial that even during that first interview, she told her "story from start to finish" and made no mention of oral sex. As Senior Judge Penland noted in *Davis II*, the victim's "omissions, including regarding the details defining the *actus reus* of the charged offense, is striking." 2025 CCA LEXIS 431, at *14.

Along the same lines, and perhaps even more significantly, at trial the victim *denied* that her intoxication levels had any effect on her ability to remember the events in question. When asked on cross-examination about her multiple statements to CID to the contrary, the victim's only explanation was that she did not "recall" what she told CID. Likewise, when impeached with other contradictory statements that she made to multiple agents, the victim simply continued to claim that she did not remember making those statements to CID.

In addition to the issues raised in her testimony, the defense called no less than five witnesses, all of whom were well acquainted with the victim, either as part of the same friend group, or as her squad leader, to testify about the victim's character for untruthfulness. Specifically, these witnesses described the victim as:

- "Very untrustworthy;"
- "Untruthful;"

- "[S]he is a manipulator, and she doesn't tell the full truth;"
- "[S]he is not truthful;"
- "[S]he's not truthful."

On the other hand, not a single witness vouched for the victim's credibility or in any way contradicted the defense character witnesses.

In addition to her general character for untruthfulness, at trial the victim denied that she ever kissed appellant. The defense, however, presented a credible witness who described with specificity the time and place he saw the victim kissing appellant on the dance floor of a local bar. Likewise, when asked if she ever stated in front of other soldiers that she wanted to have a "threesome" with appellant, the victim first denied ever saying such a thing. When pressed with the specific details, the victim stated only "[j]okingly proposition could have been possible." But again, the defense presented credible witness testimony that the victim talked about having a "threesome" with appellant in front of their friends on multiple occasions. Specifically, the witness described how the victim "would normally initiate [the talk about a threesome] and then [appellant] would, you know, respond, and, you know, they'd go forth and try to find someone for the group." Finally, although the victim claimed that she never stated in a car full of other people that she was going to have sex with appellant, another defense witness credibly testified to the contrary:

> I don't exactly remember the whole conversation. I just remember, when we parked at [the victim's] house, I was the passenger, I was next to my friend driving, and [the victim] was behind me. And it was something because it went back and forth. And then it was – [the victim] said that she's going to have sex with [appellant]. And then [appellant] was like, "Did you hear that?" And then -- because [appellant] was sitting behind the driver, I like looked, and he was like right there. And I was like, "Yeah, I heard that." And my friend -- like we both acknowledged it and like laughed. And then they went inside to [the victim's] house.
>
> . . .
>
> She said -- she either said she's going to have sex or she's going to f*** [appellant]. I can't tell you exactly what she said, but, basically, she said she's going to have sex with [appellant].

Although the lead opinion correctly points out that at the time of trial most of the defense "friend group" character witnesses were no longer close with the victim

(perhaps because they believed she made a false claim against appellant), it is hard to fathom that *five* separate soldiers would all perjure themselves by fabricating these detailed accounts just to impeach the victim or otherwise help appellant avoid conviction.

Finally, a defense witness testified that appellant called him on the morning after the alleged assault to say that he and the victim had finally "hooked up." Appellant described to this witness how he and the victim were making out, he gave her oral sex, and they cuddled. Per the witness, appellant was "like super excited to tell me about the news." Likewise, after appellant became aware that the victim believed he assaulted her, another witness testified that appellant was "confused" and "blindsided," as he thought everything was consensual. Finally, a third witness similarly testified that appellant told her that "'I don't know what's wrong. I don't know. I didn't do anything wrong, and I don't' – he didn't expect that response from her."

In sum, this is not simply a case where a victim's testimony is immaterially inconsistent with some of her prior statements. Rather, the record here demonstrates: (1) a number of significant unresolved and unexplained contradictions between the victim's testimony at trial and her prior CID statements; (2) multiple witnesses who testified that the victim was untruthful and specifically refuted her denials of prior incidents that meaningfully undercut her claims; and (3) evidence of appellant's reactions both before and after he learned the victim was claiming that he assaulted her, which is entirely consistent with, at minimum, a mistake of fact defense.

Accordingly, even after acknowledging and giving the appropriate level of deference to the trial court, who saw and heard the witnesses, after conducting my own fresh and impartial review of the record, I cannot say that the evidence at trial proved appellant's guilt beyond a reasonable doubt.

FOR THE COURT

JAMES W. HERRING, JR.
Clerk of Court

20